## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THERESA KAY MOORE,** | : | **Civil No.  1:21-CV-1769** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Theresa Moore's Social Security appeal calls upon us to consider longstanding principles regarding the duty of an Administrative Law Judge (ALJ) to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly when that RFC rejects the medical opinions on the record before the ALJ. We are then invited to apply these settled tenets to the Commissioner's current regulations governing the evaluation of medical opinions.

Theresa Moore asserted that she was disabled due to her degenerative disc disease, low back pain and neck pain, and left arm numbness. Moore's treating physician opined that she was significantly limited in her ability to sit, stand, and walk, as well as lift and carry things greater than five pounds due to her pain.

1

Conversely, a state agency consulting physician opined that Moore could perform a range of medium exertional work, with no significant limitations regarding her ability to sit, stand, walk, lift, and carry, and no limitations on her abilities to push and pull with her upper extremities.

In denying Moore's disability application, the ALJ found the opinion of the consulting physician to be moderately persuasive, and he found the opinion of Moore's treating doctor to be unpersuasive with respect to these limitations. (Tr. 17-18). In doing so, the ALJ gave cursory treatment to these medical opinions, reasoning that the treating physician's opinion regarding these functional limitations was "inconsistent with the other substantial evidence of record as more fully set forth above." (Tr. 18). The ALJ further reasoned that while the consulting physician limited Moore to medium exertional work, the treatment records suggested she would be limited to a range of light work. (Id.) This reasoning by the ALJ which formed the lynchpin of the decision in this case was unaccompanied by any reference to specific findings by these physicians, as well as a discussion of the supportability and consistency of these opinions with respect to the medical record.

While the Commissioner contends that this result was justified under the new regulations governing evaluation of medical opinions, we believe that these new regulations do not relieve the ALJ of the responsibility of adequately articulating the

2

basis for a medical opinions evaluation. Mindful of the fact that it is the province of the ALJ to choose which medical opinion evidence to credit, provided that the decision is accompanied by an adequately articulated rationale, we conclude that the ALJ's burden of articulation has not been met in this appeal. Accordingly, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## II.   <u>Statement of Facts and of the Case</u>

On November 8, 2018, Theresa Moore applied for disability insurance benefits alleging that she was totally disabled due to migraines, left arm and hand numbness, neck/pinched nerve and disc problems, lower back, and high blood pressure. (Tr. 11, 117). Moore was 47 years old at the time of the alleged onset of her disability. (Tr. 116). Moore had a high school education and had past work as a home health aide and a food sales clerk. (Tr. 18).

With respect to these physical impairments, the medical record revealed the following: Moore had a history of back pain since at least 2007, and she had undergone back surgery to repair a lumbar disc. (Tr. 382). An MRI of the cervical spine in May of 2016 showed multilevel stenosis. (Tr. 862). In August of 2016, Moore began treating with decompression therapy at the Wyoming Valley Spine and Nerve Institute. (Tr. 1013). It was reported that Moore was doing well until she was

involved in a motor vehicle accident in December of 2016. (Tr. 1028, 1150). Following this motor vehicle accident, in January of 2017 treatment notes indicate that Moore was unable to work, and she was in a lot of pain and not getting much relief from the decompression therapy. (Tr. 354). Around this time, Moore was also treated for her headaches. (Tr. 612). In February 2017, it was noted that Moore was placed in a back brace, and she felt that she was slightly improving. (Tr. 355). Treatment notes from March indicate that Moore was participating in physical therapy, decompression therapy, and seeing a chiropractor. (Id.)

In March of 2017, Moore presented to her primary care provider with complaints of chronic neck pain and bilateral lower back pain. (Tr. 610). At this time, it was noted that Moore had been treating for chronic neck pain since May 2016, and that at that time, she also complained of numbness and tingling in her left arm. (Id.) On examination, Moore's gait and station was normal, she had 5/5 muscle strength, and her straight leg raise testing was negative bilaterally. (Tr. 611). An MRI was ordered, which showed degenerative changes without significant spinal canal stenosis or nerve impingement, and Moore was referred for non-surgical spine care. (Tr. 400, 609).

Treatment notes from April of 2017, indicate that Moore established with a new primary care physician at Sayre. (Tr. 606). She complained of neck and lower

4

back pain. (Id.) On examination, she exhibited decreased range of motion in her lumbar spine with pain and moderate spasms, and her muscle strength was 5/5 with negative straight leg raise testing. (Tr. 607-08). Later that month, Moore presented to the emergency room in complaining of lower back, neck, and head pain. (Tr. 390). She reported that she had moderate to severe neck pain associated with her headache, as well as numbness in her left upper extremity. (Tr. 394). On examination, she had normal range of motion and no sensory or motor deficit. (Tr. 395). She was discharged with instructions to follow up with her primary care physician for a possible referral to a neurosurgeon. (Tr. 396).

Moore treated with Dr. Christopher Minello, D.O., in July of 2017. (Tr. 599). She complained of neck and back pain, as well as occasional dizziness, headaches, and tingling and numbness of her left arm. (Tr. 600). On examination, Moore exhibited decreased range of motion in her cervical spine with tenderness, pain, and spasm. (Tr. 601). Dr. Minello started her on Cymbalta for her pain. (Id.) In August, Moore went to the emergency room complaining of left arm pain. (Tr. 381). Her physical examination was normal, and she was given pain medications and advised to follow up with her primary care doctor. (Tr. 386-87). Moore was seen again at the emergency room a few weeks later for a severe headache with accompanying neck pain. (Tr. 437). On examination, her ability to lift her arms was limited secondary to

5

weakness, but her sensation was intact bilaterally. (Tr. 438). A head CT was ordered but revealed no acute findings. (Tr. 433). In September of 2017, it was noted that the chiropractor had been helping Moore's neck pain, but it was no longer covered by her insurance. (Tr. 429).

In October and November of 2017, Moore continued to complain of back pain, neck, pain, and headaches. (Tr. 365-68). She reported that therapy was providing no relief. (Tr. 365). An MRI at this time revealed multilevel spinal canal stenosis with multilevel degenerative disc disease. (Id.) Treatment notes indicate that Moore had lost her grip in her left hand, and that her activities of daily living were becoming difficult to maintain. (Tr. 364).

Moore was treating at a rehabilitation clinic in February of 2018, where it was noted that her neck pain and arm symptoms were largely unchanged, and Moore presented with decreased step length and easy fatigability. (Tr. 421). Her medications were changed, and it was noted she had a Neurology appointment later that month. (Tr. 423). At her Neurology appointment, Moore reported that her headaches were less frequent and debilitating, but that she was experiencing dizziness. (Tr. 417). On examination, she exhibited decreased sensation in her upper left extremity, pain with all range of motion in her upper extremities, and she had an

antalgic gait. (Tr. 419-20). An EMG was ordered, which showed a pinched nerve, and Moore was referred to neurosurgery. (Tr. 482).

Moore was involved in a second motor vehicle accident in December of 2018. (Tr. 745). She went to the emergency room, where imaging showed no new injuries or fractures. (Tr. 745, 762) On examination, she exhibited pain and tenderness in her cervical and lumbar spine. (Tr. 747). A head CT revealed normal findings. (Tr. 761). At a follow up visit with Dr. Minello in March of 2019, it was noted that Moore's headaches had improved since the accident but her back and neck pain had worsened. (Tr 742). On examination, she exhibited tenderness in her cervical spine and decreased range of motion in her lumbar spine. (Tr. 743). Two weeks later, Moore reported to Dr. Minello that her limb twitches had gotten worse, and that she was recently experiencing pain in her left knee. (Tr. 738). A physical examination revealed mild effusion in her left knee but normal range of motion and no swelling. (Tr. 740). Moore presented to the Towanda Memorial Hospital emergency department in August of 2019 complaining of lower back pain and vomiting. (Tr. 1070). Her physical examination was normal with no active pain noted on palpation. (Tr. 1071).

In January of 2020, Moore continued to treat with Dr. Minello for her chronic pain. (Tr. 1053-57). A physical examination revealed decreased range of motion,

tenderness, bony tenderness, pain and spasm in her cervical and lumbar spine. (Tr. 1056-57). Her straight leg raise was positive bilaterally, her gait was normal, and her muscle strength was 5/5 in all extremities except the left upper extremity, which was 4/5. (Tr. 1057). At this time, Dr. Minello noted his opinion that Moore was unable to work at this time due to her chronic back pain, that she was having headaches two times per week which interfered with her ability to function, and that her twitching episodes limited her activities of daily living. (Tr. 1057-58). An X-ray of the spine in February of 2020 showed degenerative disc disease at L5-S1 and L4-L5. (Tr. 760).

Dr. Minello filled out a headache questionnaire, a lumbar spine questionnaire, and a multiple impairment questionnaire in February of 2020. (Tr. 776-81, 783-89, 791-95). With respect to Moore's headaches, Dr. Minello opined that her headaches would periodically interfere with her concentration and attention, and that Moore was capable of performing activities while she had a headache. (Tr. 779-80). With respect to her lumbar spine issues, Dr. Minello opined that Moore could sit, stand, and walk only 1 hour in an 8-hour day; that she would have to get up and move around every 20 to 30 minutes; that she could only occasionally lift and carry up to 5 pounds; that she could never push, pull, kneel, bend, or stoop; and that she would likely be absent more than 3 times per month due to her symptoms. (Tr. 783-89). Dr. Minello also opined as to Moore's chronic neck pain and muscle twitching, finding

the same postural limitations as set forth in the lumbar spine questionnaire. (Tr. 791-95).

Dr. Minello also wrote a "To whomever it may concern" letter in May of 2020 describing Moore's impairments. (Tr. 796-98). Dr. Minello explained that he had treated Moore since July of 2017 for her chronic pain. (Tr. 796). Dr. Minello further opined that Moore could only sit/stand/walk for up to one hour at a time before needing rest; she needed to change positions evert 20 to 30 minutes; she could never lift or carry more than five pounds; she required long breaks because of her headaches which caused visual disturbances and impaired her concentration; and that she was unable to push, pull, kneel, bend, or stoop for any significant amount of time. (Tr. 797).

It was against this clinical backdrop that an ALJ conducted a hearing regarding Moore's disability application on September 30, 2020.[1] (Tr. 76-115). Moore and a vocational expert both appeared and testified at this hearing. (Id.) In her testimony, Moore described the severity of her physical impairments in terms

---

[1] This was the third scheduled hearing in Moore's case. Moore was unrepresented at the first hearing, and the ALJ continued the hearing to give Moore an opportunity to obtain representation. (Tr. 58-63). At the time of the second scheduled hearing, Moore had just obtained representation, and the ALJ granted another continuance to give her representatives an opportunity to gather the medical records and prepare for the administrative hearing. (Tr. 64-75).

that were consistent with the views of her treating provider, describing radiating pain through her lumbar and cervical spine, twitching of her limbs, neck stiffness due to headaches, and a significant limitation regarding her walking, sitting, standing, and lifting capabilities. (Tr. 93-102).

Following this hearing on January 11, 2021, the ALJ issued a decision denying Moore's application for benefits. (Tr. 8-25). In that decision, the ALJ first concluded that Moore satisfied the insured status requirements of the Act through December 31, 2020, and she had not engaged in substantial gainful activity since her alleged onset date of September 28, 2016. (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Moore suffered from the following severe impairments: degenerative disc disease of the cervical and lumbar spine; left arm and hand numbness; hypertension; and migraine headaches. (Tr. 14).

At Step 3 the ALJ determined that Moore did not have an emotional impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 15). Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Moore's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In addition, the claimant is limited to no more than frequent climbing of ramps and

10

stairs and no more than occasional climbing of ladders, ropes, and scaffolds. The claimant is limited to no more than occasional exposure to extreme cold temperature and wetness. The claimant must avoid exposure to noise above level 3 noise intensity level. The claimant must avoid exposure to unprotected heights. The claimant is limited to no more than frequent use of the bilateral hands for grasping and fingering. The claimant should be afforded to the ability to alternate between sitting and standing every 30 minutes due to low back pain.

(Tr. 15).

In reaching this conclusion, the ALJ stated that he considered all of the medical opinions in the record, including the state agency consulting opinions and the opinion of Moore's treating physician, Dr. Minello. On this score, the ALJ's treatment of these medical opinions is entirely vague. Regarding the state agency consulting opinions, the ALJ found that these opinions were "persuasive and moderately persuasive, respectively. The longitudinal record as discussed more fully above indicates that the claimant's limitations are more consistent with a range of light work." (Tr. 18). However, the state agency consultant, Dr. James, Butcofski, M.D., opined that Moore could perform a range of medium exertional work, in that Moore could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently; she could sit, stand, and walk for 6 hours in an 8-hour workday; she could frequently climb ramps and stairs and occasionally claim ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl; and she had no manipulative limitations. (Tr. 122-23). Thus, although the ALJ declared these opinions persuasive

11

or moderately persuasive few of the limitations found by the state agency experts were ultimately incorporated into the RFC.

With respect to Dr. Minello's opinions, the ALJ found his opinions regarding Moore's migraines mildly persuasive to the extent that opinion found that Moore's headaches did not preclude her from working. (Id.) However, the ALJ then stated in a conclusory fashion that the remainder of Dr. Minello's opinions, which found that Moore was significantly limited in her ability to sit, stand, walk, lift, and carry, as well as her ability to push and pull with her upper extremities, were "inconsistent with other substantial evidence of record as more fully set forth above." (Id.) Thus, what we are presented with is a cursory assessment of two starkly contrasting medical opinions regarding Moore's physical limitations with no discussion regarding the supportability and consistency of these opinions with the medical treatment records. Indeed, the ALJ did not discuss the discrepancies between these two drastically different opinions regarding Moore's physical limitations, nor did he explain which evidence he relied on to form this RFC determination which differed from all of the expert opinions.

The ALJ then found that Moore could not perform her past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 18-19). Having reached these conclusions, the ALJ determined that

Moore had not met the demanding showing necessary to sustain her claim for benefits and denied her claim. (Tr. 19-20).

This appeal followed. (Doc. 1). On appeal, Moore challenges the adequacy of the ALJ's explanation of this RFC determination, arguing that the ALJ erred in his assessment of these medical opinions. While the Commissioner contends that this result was justified under the new regulations governing evaluation of medical opinions, we disagree. These new regulations changed the analytical paradigm for assessing medical opinions, but they did not relieve the ALJ of the responsibility of adequately articulating the basis for a medical opinion evaluation. Thus, mindful of the fact that it is the province of the ALJ to choose which medical opinion evidence to credit, provided that the decision is accompanied by an adequately articulated rationale, we conclude that the ALJ's treatment of these medical opinions is not accompanied by an adequately articulated rationale in this case. Accordingly, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

15

matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

16

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

17

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also</u> <u>Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In

20

this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

Moore filed her disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer

22

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

23

persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV– 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);

> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

It is against these legal benchmarks that we assess the instant appeal.

### D.   This Case Will Be Remanded for Further Consideration of the Medical Opinion Evidence.

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. In the instant case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation, and we will remand the case for further proceedings.

In the instant case, the ALJ limited Moore to a range of light work with some postural limitations. In making this determination, the ALJ stated that he considered the opinion of Moore's treating physician, Dr. Minello, but found that his limitations "were inconsistent with other substantial evidence of record." While we appreciate

the Commissioner's argument that the analytical paradigm that applies to evaluating

medical opinions fundamentally changed in March of 2017, in our view that change

does not alter the significance of medical opinion evidence to a disability analysis.

Nor does that paradigm shift discount the longstanding legal principles which called

for a clear articulation of the ALJ's rationale in making a disability determination.

Moreover, in the absence of some further explanation and articulation of its

rationale, the ALJ's decision cannot be reconciled with the revised medical opinion

regulations that the ALJ was obliged to follow. Those regulations eschew any

hierarchical ranking of opinions, but call upon ALJ's to evaluate medical opinions

against the following benchmarks:

> (1) Supportability. The more relevant the objective medical evidence
> and supporting explanations presented by a medical source are to
> support his or her medical opinion(s) or prior administrative medical
> finding(s), the more persuasive the medical opinions or prior
> administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior
> administrative medical finding(s) is with the evidence from other
> medical sources and nonmedical sources in the claim, the more
> persuasive the medical opinion(s) or prior administrative medical
> finding(s) will be.

> (3) Relationship with the claimant. This factor combines consideration
> of the issues in paragraphs (c)(3)(i) through (v) of this section.

>> (i) Length of the treatment relationship. The length of time a
>> medical source has treated you may help demonstrate whether

26

the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

In this case, Dr. Minello opined that Moore was significantly limited in her ability to lift, carry, stand, sit, and walk, as well as her ability to push, pull, bend, kneel, and stoop. This opinion stood in stark contrast to the state agency expert source opinion, which found that Moore could perform a range of medium work. In rejecting Dr. Minello's opinion, the ALJ did not indicate which evidence he relied upon. Rather, the ALJ vaguely stated that Dr. Minello's opinion was inconsistent with the evidence of record. Likewise, the ALJ cited to the longitudinal record

without any further explanation when stating that the state agency opinion had greater persuasiveness.

We cannot conclude that this cursory treatment of the opinion of Moore's treating physician, whom she treated with for several years for these chronic conditions, is supported by substantial evidence. In the same vein we cannot discern what aspects of the state agency opinions were persuasive since few of those specific state agency findings made their way into the RFC adopted by the ALJ. Rather, we are left to speculate regarding how the ALJ came to this RFC determination, which evidence he relied on, and the reasons that he rejected this treating source opinion as well as discounting many aspects of the state agency expert opinion. While it is true that "[t]he ALJ–not treating or examining physicians or State agency consultants– must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361, the ALJ's determination still must meet the basic substantive standards which require the ALJ to "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433.

In our view, even under the new regulations governing evaluation of medical opinion evidence, more is needed by way of an explanation. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that

nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.  **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED:      February 13, 2023